# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

LAM THANH PHAM,
Defendant-Appellant.

No. 06-30489

D.C. No.
CR-05-00152-004-
RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
February 4, 2008—Seattle, Washington

Filed September 23, 2008

Before: Raymond C. Fisher, Ronald M. Gould, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Gould;
Concurrence by Judge Fisher

**COUNSEL**

Jonathan S. Solovy, Esq., Law Office of Jonathan S. Solovy, PLLC, Seattle, Washington, for appellant Lam Thanh Pham.

Jeffrey C. Sullivan and Patricia C. Lally, U.S. Attorney's Office, Seattle, Washington, for appellee United States of America.

## OPINION

GOULD, Circuit Judge:

This case illustrates the dangers of an identity theft scheme whereby many persons and financial institutions are impacted when criminals steal identities. Lam Thanh Pham ("Pham") appeals the 78-month sentence and $1 million restitution order imposed on him after he pled guilty to one count of bank fraud in violation of 18 U.S.C. § 1344.[1] Pham and five other individuals were indicted on forty-four counts of bank fraud in connection with a massive identity theft scheme that compromised the bank accounts of ninety-five people held by fourteen different financial institutions and resulted in more than $1.6 million in loss. Pham's guilty plea followed. Pham contends that it was error for the district court to apply a four-level enhancement to his sentence for a property crime involving fifty or more victims where the shortfalls in the accounts of the ninety-five individuals whose identities were stolen were fully reimbursed by their banks. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and we vacate Pham's sentence and remand for resentencing on an open record.

## I

Officials of the Starbucks Coffee Company alerted the FBI that numerous Starbucks employees had had their identities stolen and that counterfeit checks had been cashed on these employees' bank accounts. The ensuing investigation led to the indictments of eight individuals, including six people jointly indicted by a grand jury in the Western District of

---

[1]The remaining issues presented in Pham's appeal, as well as all issues presented on appeal by My Thi Tran, who was indicted as a participant in the same identity theft/bank fraud scheme and whose appeal, # 06-30529, was consolidated with that of Pham, are addressed in a memorandum disposition filed concurrently with this opinion.

Washington on April 14, 2005 on forty-four counts of bank fraud in violation of 18 U.S.C. § 1344. One of those indicted was Lam Thanh Pham, who other participants described as a "boss" or "mastermind" of the scheme. According to these co-conspirators, Pham created fraudulent driver's licenses and other identifying documents and orchestrated counterfeit check cashing activities, the proceeds of which were then deposited in his bank account or the account of another scheme leader's girlfriend.

Charging documents alleged the following facts about the fraud scheme in which Pham was involved: Members of the scheme's group of identity thieves obtained personal information, including bank account information, for individuals or "targets" and used that information to create fraudulent identification documents and counterfeit checks made out to those individuals. Participants in the scheme visited banks posing as the targets, deposited the counterfeit checks and withdrew the entire amount of the checks in cash. When the checks were later determined not to be valid, the banks debited the targets' accounts by the amount of the check. Because many checks were written for large sums, this resulted in diminished and even negative balances in the affected accounts. Once targets discovered that their identities had been stolen and notified their banks of the problem, their accounts were restored and the banks absorbed the losses, which the FBI estimated to total $1,662,873.95.

Pham entered a guilty plea to one count of bank fraud on May 1, 2006. The plea agreement stipulated that the amount of loss attributable to Pham would be determined at sentencing but would not exceed $1 million. The agreement further stated that the government would seek an "upward adjustment" under United States Sentencing Guidelines ("USSG") § 2B1.1(b)(2) because Pham's offense involved at least ten victims.

In its presentence report on Pham, the United States Probation Office recommended a fourteen-level enhancement under

USSG § 2B1.1(b)(1)(H) for actual losses of between $400,000 and $1 million and a four-level enhancement under USSG § 2B1.1(b)(2)(B) for an offense involving fifty or more victims. The government agreed with both of these recommendations in its sentencing memorandum, stressing, with respect to the number of victims, the ninety-five individuals whose bank accounts were compromised in addition to the fourteen banks that were affected. As evidence to support these enhancements, the government provided a spreadsheet prepared by the FBI detailing the withdrawals made by the check cashers and the bank accounts from which those funds were taken. The government also offered a Victim Impact Statement from one married couple who had been targeted by the scheme. This statement itemized financial losses the couple had suffered as a result of having their identities stolen, such as $1,003 for three vacation days spent resolving the problems with their account, $336.85 in insufficient funds and collection agency fees (some of which were ultimately refunded by their bank), $13.49 for certified letters to credit reporting agencies, $96 for replacement checks, and $10 for printer ink and paper to write letters. This statement also described the "month of sleepless nights" the couple had spent before the situation with their bank was resolved. Pham argued in his sentencing memorandum that only a two-level enhancement under USSG § 2B1.1(b)(2)(A)(i) was warranted because only the fourteen financial institutions had sustained actual monetary loss as documented in the government's spreadsheet.

At Pham's sentencing hearing, the government contended that the ninety-five account holders targeted by the scheme had suffered "actual loss" in the form of "making phone calls . . . to their banks, taking off work, driving to their banks, . . . [and] [b]orrowing money to make ends meet." Pham's attorney responded that the Guidelines define "victims" as those who have suffered some pecuniary harm and that this term cannot include "people who have to go through a lot of upset, hassle and non-pecuniary suffering." The district court sided

with the government and applied a four-level enhancement for fifty or more victims, concluding that "the evidence that I've heard of people whose lives were disrupted, who had to make extraordinary efforts to get banks to take their complaints seriously, to deal with bills that weren't paid, problems that came up with their credit, was much more than a short-lived monetary loss that was immediately covered by a third party" and so was sufficient to qualify the ninety-five account holders as "victims" for purposes of the sentence enhancement. The district court then sentenced Pham to seventy-eight months in prison and five years of supervised release, as well as ordering him to pay restitution in the amount of $1 million. This timely appeal of Pham's sentence followed.

## II

We review a district court's interpretations of the federal Sentencing Guidelines de novo, its factual determinations for clear error, and its application of the Sentencing Guidelines to the facts as it has found them for abuse of discretion. *United States v. Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005). If upon review we conclude that the district court committed a "significant procedural error," *see Gall v. United States*, 128 S. Ct. 586, 597 (2007), such as a "material error in the Guidelines calculation that serves as the starting point for the district court's sentencing decision, we will remand for resentencing pursuant to 18 U.S.C. § 3742(f)." *United States v. Cantrell*, 433 F.3d 1269, 1280 (9th Cir. 2006). If no such material error in applying the Guidelines is found, however, we may go on to evaluate the sentence for its substantive reasonableness under an abuse of discretion standard. *See Gall*, 128 S. Ct. at 597; *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).

## III

**[1]** Section 2B1.1(b)(2) of the U.S. Sentencing Guidelines provides for a four-level enhancement where the offense

involved at least fifty but fewer than 250 victims. The commentary to § 2B1.1 further provides that a "victim" is any person who either (a) "sustained any part of the actual loss determined under subsection (b)(1)"; or (b) "sustained bodily injury as a result of the offense." USSG § 2B1.1 cmt. n.1. "Actual loss" is in turn defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* n.3(A)(i). "Pecuniary harm" means "harm that is monetary or that otherwise is readily measurable in money" and "does not include emotional distress, harm to reputation, or other non-economic harm." *Id.* n.3(A)(iii). For such pecuniary harm to be "reasonably foreseeable," the defendant must have known, or under the circumstances reasonably should have known, that such harm was a potential result of the offense. *See id.* n.3(A)(iv). Finally, the Guidelines provide that loss "shall not include [either] [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs[,]" or "[c]osts to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense." *Id.* n.3(D).

The government has advanced two distinct theories that would support counting the individual bank account holder "targets" as "victims" of Pham's fraud for purposes of § 2B1.1(b)(2). Each of these theories presents issues of first impression in our circuit.

**A**

One government theory posits that because the amounts covered by the counterfeit checks were debited from these individuals' accounts, they suffered "actual loss" when those checks were rejected and their accounts were depleted. Pham responds that to count the same financial losses ultimately absorbed by the banks as having been suffered by the account holders as well would constitute an impermissible double counting. We reject Pham's double-counting contention.

**[2]** "Impermissible double counting occurs when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Stoterau*, 524 F.3d 988, 1001 (9th Cir. 2008) (internal quotation marks omitted). However, we have held that "[t]here is nothing wrong with 'double counting' when it is necessary to make the defendant's sentence reflect the full extent of the wrongfulness of his conduct." *United States v. Thornton*, 511 F.3d 1221, 1228 (9th Cir. 2008) (internal quotation marks omitted); *see also United States v. Holt*, 510 F.3d 1007, 1012 (9th Cir. 2007) ("Because the two enhancements account for . . . distinct wrongs, it was proper, and no abuse of discretion, for the district court to apply both to the challenged criminal conduct.").

**[3]** This case differs from *Thornton* and *Holt*, and from all other cases in our circuit in which double counting arguments have been raised, in that here only one Guidelines provision, USSG § 2B1.1(b)(2), is at issue, and the question is the proper size of the enhancement for number of victims under that provision. Despite this difference, the principles that have guided our other double counting cases remain applicable here. If the account holders and the banks suffered "distinct wrongs" as a result of Pham's conduct and if accounting for those distinct wrongs is necessary "to make the defendant's sentence reflect the full extent of the wrongfulness of his conduct," then we hold that it is not impermissible double counting to consider both groups as victims even if their losses are ultimately traceable to the same fraudulently obtained funds.

**[4]** Here, Pham and his co-conspirators stole confidential identifying information from fifty or more individuals to use that personal information to commit bank fraud. The theft of this personal information and the subsequent withdrawal of money from the identity theft victims' accounts resulted in "reasonably foreseeable pecuniary harm" to those account holders when their accounts were debited, thus causing them

to suffer "actual loss" within the meaning of the Guidelines. *See* USSG § 2B1.1 cmt. n.3(A)(i). At the same time, the participants in the scheme committed their fraud by presenting counterfeit checks to banks, and it was also reasonably foreseeable that the banks would ultimately cover the account holders' losses and thus suffer pecuniary harm as well. *See id.* The fact that the same funds were involved in both losses does not preclude both the account holders and the banks from suffering harm or mean that the harms they suffered were identical. Just as a single gunshot would have two victims suffering two distinct injuries if the bullet passed through one person before striking a second, here Pham's criminal acts could have two groups of victims suffering distinct pecuniary harms where the debits to the account balances first suffered by the account holders were later absorbed by the banks. That the losses sustained by the account holders turned out to be temporary does not necessarily disqualify the account holders as victims either, because, to illustrate, an individual who "sustained bodily injury as a result of the offense" would still be considered a victim under part B of the definition found in application note 1 to USSG § 2B1.1 even if he subsequently recovered from that injury. We therefore hold that where a bank fraud offense results in initial losses by bank account holders of the funds in their accounts and a more permanent loss of those same funds by banks or other financial institutions when those institutions reimburse the account holders, both the account holders and the banks have suffered harms that are "pecuniary" and "reasonably foreseeable" for purposes of the Guidelines' definition of "actual loss" and that are sufficiently distinct from one another to avoid a double counting problem. *See Thornton*, 511 F.3d at 1228; *Holt*, 510 F.3d at 1012.

Some of our sister circuits have encountered a different type of "double counting" problem in cases that involve calculations of loss under § 2B1.1(b)(1). This version of "double counting" occurs where the same fraudulent check or stolen credit card is erroneously counted twice in estimating the total

loss attributable to a defendant. Reviewing courts have found such errors to be material only where they bring the amount of loss into a different category for Guidelines purposes, such as from $900,000, which would carry a fourteen-level enhancement under § 2B1.1(b)(1)(H), to $1.1 million, which would carry a sixteen-level enhancement under § 2B1.1(b)(1)(I). *See, e.g.*, *United States v. Mickens*, 453 F.3d 668, 671-72 (6th Cir. 2006) (holding that even if one of the government's calculation methods impermissibly counted funds obtained from the same stolen credit card towards both actual and intended loss, any error was harmless because an alternate calculation method, which was free of any double counting, also resulted in a loss amount of between $120,000 and $400,000 and thus application of the same enhancement); *United States v. Lee*, 427 F.3d 881, 896 (11th Cir. 2005) (describing a defendant's argument that two invalid checks intended to cause a single loss were both erroneously included in her total loss amount but not that of her codefendant and explaining that this "double-counting" resulted in a total loss amount of more than $1 million and a sixteen-level enhancement for the appealing defendant as compared to a fourteen-level enhancement for the codefendant).

**[5]** No such boundary between loss categories under § 2B1.1(b)(1) is implicated here, for while the method of counting victims discussed above does attribute losses of the same funds to the banks and to the account holders, the total amount of loss for which Pham was held responsible did not correspondingly increase. Instead, the government stipulated as part of Pham's plea agreement that the amount of loss would not exceed $1 million, despite the FBI's finding that more than $1.6 million was involved. Consistent with this stipulation, Pham was given a fourteen-level enhancement under USSG § 2B1.1(b)(1)(H) for losses of between $400,000 and $1 million. Accordingly, any double counting of losses had no effect on the total amount of loss attributed to Pham and was only relevant to the victim-related enhancement at § 2B1.1(b)(2), a purpose for which double counting is war-

ranted, as discussed above, because of the distinct harms that Pham's conduct caused to these two groups of victims. *See Thornton*, 511 F.3d at 1228.

**[6]** Despite the lack of a double-counting problem, the individual account holders can still be counted as "victims" of Pham's bank fraud offense only if they "sustained any part of the actual loss determined under" § 2B1.1(b)(1). *See* § 2B1.1 cmt. n.1. The Sixth Circuit, interpreting this language in a case with similar facts to this one, has held that where bank account holders' "monetary loss is short-lived and immediately covered by a third-party," the bank, those account holders have not suffered any " 'actual loss' or 'pecuniary harm.' " *United States v. Yagar*, 404 F.3d 967, 971 (6th Cir. 2005). The district court in this case agreed with the Sixth Circuit's analysis and we, too, conclude it is persuasive. If the account holders victimized by Pham were fully reimbursed as soon as they notified their banks of the fraudulent activity, then they cannot reasonably be said to have suffered or "sustained" the losses that were only temporarily and fleetingly reflected in their accounts. As the Sixth Circuit reasoned in *Yagar*: they would have "suffered no adverse effect as a practical matter from [the defendant's] conduct." *Id.*

**[7]** However, the Sixth Circuit in *Yagar* pointed out that "there may be situations in which a person could be considered a 'victim' under the Guidelines even though he or she is ultimately reimbursed . . . ." *Id.* This case may present just such a situation. The government's proffered Victim Impact Statement made clear that, at least for some of the account holders, the refund was not instantaneous. To the contrary, one couple referred to their "month of sleepless nights" and stated that it took "several weeks [and] many emails and phone calls" until the amount of the counterfeit check was refunded and their account was unfrozen. The district court commented at Pham's sentencing that

> the fact that ultimately people were restored to the state they were in before the crime was committed,

some after some considerable *time*, effort and expense, is what the Court in *Yagar* said[—"]while there may be situations in which a person could be considered a victim under the [G]uidelines, even though he or she is ultimately reimbursed["]—that I believe this case fits under that.

(Emphasis added).

Following similar logic, the Eleventh Circuit diverged from the Sixth Circuit's *Yagar* approach in *United States v. Lee*. There, victims of a scheme involving the use of bad checks to purchase homes and cars offset some of their losses by pursuing foreclosure, repossession and other legal proceedings. 427 F.3d at 895. The Eleventh Circuit concluded that where the entities who sustained the bad debt had to wait "*an appreciable time* and . . . resort to a legal remedy" before being compensated by the defendants, they could properly be considered "victims" for purposes of § 2B1.1 despite ultimately recovering most or all of their initial losses. *See id.* (emphasis added).

This case differs from *Lee* in two key respects. First, the *Lee* victims' losses were not reimbursed by a third party but rather were recouped from the defendants themselves after the victims took legal action against them. *Id.* ("In none of these cases was there a third party available to provide prompt indemnification."). By contrast, the account holders here were fully reimbursed by their banks, and the only question is whether that reimbursement was "immediate" as in *Yagar* or whether some appreciable amount of time elapsed before the accounts were replenished. Second, the *Lee* court had evidence in the record detailing what the victims had to do to recover their losses and how long those actions took. *See* 427 F.3d at 885-86. But except for the one Victim Impact Statement provided by the government, no such evidence was presented to the district court in this case.

Although the district court referred at Pham's sentencing to the "considerable time" that passed before some of the account holders were "restored to the state they were in before the crime was committed," the district court did not explain the basis for its conclusion that enough time had elapsed for these account holders to distinguish their situation from the "short-lived" losses "immediately covered by a third-party" in *Yagar*. Nor did the district court explain how this temporal reasoning could bring the total number of victims of the offense to fifty, where only the losses of the fourteen financial institution victims were itemized in the government's spreadsheet and the experiences of only one other account holder[2] were recounted in the Victim Impact Statement.

[8] The government has the burden of proving the facts necessary to support a sentence enhancement by a preponderance of the evidence. *See United States v. Allen*, 434 F.3d 1166, 1173 (9th Cir. 2006). Here, the government provided evidence that one account holder and his wife had experienced a delay of several weeks, and had to send many e-mails and make many phone calls, before the funds in their compromised account were restored. If similar evidence, or evidence of something more than a "short-lived [loss] immediately covered by a third-party" had been produced for enough of the other account holders[3] to bring this case outside of the situa-

---

[2] Although the Victim Impact Statement was signed by both husband and wife, the FBI spreadsheet shows that the affected account was in the husband's name, and so the government counted this couple as a single "victim" in reaching its figure of ninety-five account holder victims.

[3] Evidence of more than immediately reimbursed loss on the part of thirty-five account holders, in addition to the evidence already in the record about the losses suffered by the fourteen institutions listed in the spreadsheet and the one account holder who did provide a statement, would bring the total number of victims to fifty. However, it may not be necessary for the government to produce evidence along these lines for each and every one of thirty-five or more account holders. Commentary in the Guidelines suggests that the amount of loss and the number of victims can be approximated, so it likely would be sufficient for the govern-

tion covered by *Yagar*, then a four-level enhancement for fifty or more victims might have been appropriate. However, the government did not meet its evidentiary burden with respect to all but one of the account holders, and so the government's first theory does not permit imposition of the § 2B1.1(b)(2)(B) enhancement based only on the scant evidence in the record before us.

## B

The government's second theory in support of the enhancement is that the "actual loss" the account holders suffered was not the temporary shortfall in their accounts but rather collateral expenses that they incurred in the process of resolving those shortfalls and related problems. With respect to the account holder who submitted a Victim Impact Statement, these costs included $1,003 for the value of three days taken off from work to resolve account problems, $336.85 in insuf-

ment to produce evidence for enough of the account holders to allow the sentencing court reasonably to infer a pattern of delayed reimbursement. *See, e.g.*, USSG § 2B1.1 cmt. n.3(C) ("The court need only make a reasonable estimate of the loss" and may include in that estimate "[t]he approximate number of victims multiplied by the average loss to each victim"); cmt. n.4(C)(ii)(I) (creating a "Special Rule" that where an offense involved the theft or attempted theft of mail from "a United States Postal Service relay box, collection box, delivery vehicle, satchel, or cart, [the offense] shall be considered to have involved at least 50 victims"). We decline to specify at this time how many account holders would have to provide evidence and what form that evidence would have to take to support such an inference, because our proper role is to review decisions on such matters by the district court for abuse of discretion after the record is developed. *See United States v. Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005). However, the delay in reimbursement of several weeks and perhaps as much as a month experienced by one account holder and documented in his Victim Impact Statement is very different from the "short-lived," "immediately reimbursed" loss discussed in *Yagar*, and qualifies this individual as a victim for purposes of USSG § 2B1.1 by virtue of the concrete, albeit temporary, financial loss he suffered when his bank account was depleted.

ficient funds and collection agency fees (some of which were ultimately refunded by the bank), $13.49 for certified letters to credit reporting agencies, $96 for replacement checks, and $10 for printer ink and paper to write letters. Pham contends that these expenses are the sort of "other . . . costs" "similar" to interest, finance charges, and late fees that the Guidelines have explicitly excluded from the calculation of loss under § 2B1.1. *See* USSG § 2B1.1 cmt. n.3(D)(i). With the possible exception of insufficient funds and collection agency charges incurred when the account was in overdraft, however, the costs described in the Victim Impact Statement are not "similar" to the finance charges, late fees, and other penalties covered by this application note, and we conclude that they do not fall within its reach. Moreover, the costs of forfeited vacation time spent meeting with bank personnel were not expended "primarily to aid the government in . . . the prosecution and criminal investigation of [this] offense" but rather to resolve the couple's own financial situation, and so these costs do not fit the Guidelines' other exception for government assistance expenses. USSG § 2B1.1 cmt. n.3(D)(ii).

**[9]** The sorts of costs set forth in the Victim Impact Statement and the other examples given by the government at Pham's sentencing and in its appellate brief, such as the cost of gas mileage for trips to and from banks and the cost of stamps and telephone calls, satisfy the Guidelines' definition of "actual loss" because they are "monetary" or "readily measurable in money." § 2B1.1 cmt. n.3(A)(iii). These costs associated with resolving disputed account activity, canceling credit cards and initiating fraud investigations with credit reporting agencies are also "reasonably foreseeable" consequences of identity theft, which was an integral component of this bank fraud scheme. *See id.* n.3(A)(iv). Accordingly, we hold that financial costs to bank account holders that are incurred in the course of resolving damage done to those accounts by a fraud scheme may be included in the calculation of actual loss under § 2B1.1(b)(1) and may qualify the

individuals who incurred those costs as "victims" of the offense under § 2B1.1(b)(2).

**[10]** Again, however, there is a problem of insufficient evidence. A "victim" under § 2B1.1 must have "sustained . . . part of the actual loss determined under subsection (b)(1)." § 2B1.1 cmt. n.1. The actual loss in this case was determined to be at most $1 million, based on the stipulation in the plea agreement that the government would not seek a higher amount and the FBI spreadsheet itemizing the banks' losses of more than $1.6 million. This spreadsheet did not include any information about the costs suffered by individual bank account holders in resolving the fraudulent activity on their accounts. Because no evidence of any such costs was included in the government's calculation of actual loss, those costs cannot serve as the basis for including the account holders as victims of Pham's scheme.

The Tenth Circuit has confronted a similar evidentiary problem in *United States v. Leach*, a case involving the theft by a U.S. postal employee of checks mailed to a charitable organization. 417 F.3d 1099, 1101 (10th Cir. 2005). In that case, the government had sought a four-level enhancement for an offense involving between fifty and 250 victims because "over 200 people reported undelivered donations and incurred the expense of writing and mailing a replacement check." *Id.* at 1106 (internal quotation marks omitted). The Tenth Circuit rejected this argument, noting that "[t]here was no testimony presented at the sentencing hearing regarding the type and amount of loss suffered by *donors*" and that the court's calculation of loss was based entirely on the amount of money the defendant intended to steal from the charity, which did not include the costs of replacement checks. *Id.* at 1106-07 (emphasis in original). The court concluded that because "the loss suffered by these 200 donors was not part of the actual loss determined . . . under" § 2B1.1(b)(1), the district court erred by counting the donors as 'victims' for purposes of an enhancement under U.S.S.G. § 2B1.1(b)(2)." *Id.* at 1107.

**[11]** The Tenth Circuit's reasoning in *Leach* was sound and applies with equal force to the government's arguments in this case based on collateral costs to bank account holders that were not included in the actual loss amount. Because the enhancement for fifty or more victims cannot be supported on this second theory, and for the reasons set forth in part A above with respect to the government's first theory of victim counting, we conclude that the district court erred in imposing a four-level enhancement to Pham's sentence under § 2B1.1(b)(2)(B) for an offense involving fifty or more victims.

## C

It should be obvious to any thoughtful observer of modern economic life that identity theft has the potential to cause those whose identities are stolen the gravest of concerns about lost funds, impaired credit, and impaired reputation. It is also obvious that the individual victims of Pham's scheme, though they were reimbursed by their banks, undoubtedly suffered personal anguish, anxiety and concern about the identity theft until it was satisfactorily resolved. It might be rational to say that the anxiety of persons whose identities and personal finances are compromised by identity theft justifies, in proportion to the number of anguished persons, heightened punishment. We, however, deal with statutes and statutory penalties as enacted by Congress and sentencing guidelines as specified by the United States Sentencing Commission. At the pertinent times for Pham's crime, these guidelines recognized and permitted weight to be given to pecuniary loss, but not to mental anxiety, distress, lost reputation, or other non-economic harm.

Although the Guidelines are now discretionary, the Supreme Court has continued to indicate that a correct initial assessment of the Guidelines range is a starting point before the discretionary judgment is made on a reasonable sentence in the light of the 18 U.S.C. § 3553(a) factors. *See, e.g.*, *Gall*,

128 S. Ct. at 596-97; *Carty*, 520 F.3d at 991; *Cantrell*, 433 F.3d at 1279-80. The government's case for imposing an enhancement for an offense involving fifty or more victims was not supported by a preponderance of the evidence showing that fifty or more victims suffered actual loss in the form of pecuniary harm. Because of that evidentiary deficiency, we cannot sustain the enhancement for the number of victims on the current record.

## IV

[12] Because we have identified a significant error[4] in the Guidelines calculation that provided the starting point for the district court's sentencing decision, we vacate Pham's sentence and remand this case for resentencing pursuant to 18 U.S.C. § 3742(f)(1). *Cantrell*, 433 F.3d at 1280; *see also Gall*, 128 S. Ct. at 597 (requiring that an appellate court "first ensure that the district court committed no significant procedural error, such as . . . improperly calculating . . . the Guidelines range"). In remanding, we do not limit the evidence that the district court may consider in resentencing to the evidence that was before it during Pham's initial sentencing hearing. *See United States v. Matthews*, 278 F.3d 880, 885-86 (9th Cir. 2002) (en banc) ("On remand, the district court generally should be free to consider any matters relevant to sentencing, even those that may not have been raised at the first sentencing hearing, as if it were sentencing de novo.") (citations omitted). Rather, we remand this matter on an open record so

---

[4]This error is "significant," *Gall*, 128 S. Ct. at 597, because it raised Pham's Guidelines range from 57-71 months (which would have been his range if only a two-level enhancement for ten or more victims had been applied) to 70-87 months. The 78-month sentence he received was in the middle of his Guidelines range as calculated but would have constituted an above-Guidelines sentence if he had been given only the two-point enhancement for between ten and forty-nine victims. Such an outside-Guidelines sentence would have required the district court to "consider the extent of the deviation and ensure that the justification [was] sufficiently compelling to support the degree of the variance." *Id.*

that both parties can present evidence relevant to the proper number of victims in light of this opinion's guidance on a matter of first impression in our circuit.

## SENTENCE VACATED AND REMANDED FOR RESENTENCING.

FISHER, Circuit Judge, concurring in part and concurring in the judgment:

I agree fully with all but Part III.A of the majority's opinion. If, as the majority holds in Part III.B, the government demonstrates that the account holders whose accounts were targeted by Pham's scheme incurred actual collateral expenses while convincing the banks to restore their account balances and correct errors in their credit histories, these expenses constitute reasonably foreseeable pecuniary harm arising from Pham's conduct. These individuals could therefore be counted as the "victims" of Pham's conduct for the purpose of a sentencing enhancement under U.S. Sentencing Guideline § 2B1.1(b)(2). I part ways with the majority, however, with regard to Part III.A, where the majority holds, in the alternative, that both the financial institution *and* the account holder could be counted as a "victim" based on the same actual theft of funds, which was temporarily reflected in the account holder's account balance but ultimately sustained by the bank. Although I agree that the temporary deprivation of access to one's account funds is some kind of harm, it is not a pecuniary harm, and thus it is not a kind of harm accounted for under the Guidelines.

As the majority explains, the Guidelines allow an individual to be counted as a "victim" for the purpose of a sentencing enhancement under § 2B1.1(b)(2) only if he or she "sustained any part of the actual loss" from the fraudulent scheme. U.S.S.G. § 2B1.1 cmt. n.1. This loss must be "pecuniary,"

which means "harm that is monetary or that otherwise is measurable in money," and "does not include emotional distress, harm to reputation, or other non-economic harm." *Id.* n.3(A)(iii). In Part III.A, the majority holds that the account holders could be shown to have suffered such "actual loss" because "their accounts were debited," even where "the losses sustained by the account holders turned out to be temporary" because these funds were later restored by the bank. Maj. Op. at 13392, 13393. The majority concedes that some reimbursements may be so speedy that the victim could not be said to have actually suffered or sustained the loss, but holds that a reimbursement that is not "instantaneous" is an actual pecuniary loss under the Guidelines. *Id.* at 13395. The majority thus creates a vague standard for defining "actual loss," whereby reimbursed account holders are "victims" if "some appreciable amount of time elapsed before the accounts were replenished," but not if they were "fully reimbursed as soon as they notified their banks of the fraudulent activity." *Id.* at 13395, 13396.

As the majority acknowledges, the losses to the account holders in this case turned out to be ephemeral. Pham and his co-defendants defrauded banks by impersonating legitimate account holders and presenting counterfeit checks in the account holders' names, inducing the banks to give money to Pham and his co-defendants while improperly lowering the account balance of the victimized account holder. By restoring the account holders' balances, the bank agreed that the money had not been validly drawn from these accounts. The reimbursement reflected the bank's acknowledgment that it had committed error by improperly accepting a counterfeit check and improperly debiting an individual's account for funds that were, in fact, fraudulently stolen from the bank itself. *See United States v. Erpenbeck*, 532 F.3d 423, 442 (6th Cir. 2008) ("When a customer of a bank or a creditcard company is defrauded, the customer is generally protected by an agreement that the bank or company will handle any fraud based upon unauthorized charges against the customer's

account . . . . [Thus] a loss under this type of contractual agreement is necessarily temporary, and the customers are fully reimbursed.").

I agree that it was reasonably foreseeable that the bank would mistakenly debit the holders' accounts and that — as a result — the holders would, for a time, lose access to their account funds while the bank sorted out who should be the proper party to bear the loss. Assuming the bank fully reimburses the account holders, however — including refunding any lost interest or other charges caused by the improper debiting of funds — I do not believe it can fairly be said that the account holders have suffered any actual pecuniary harm from the temporary deprivation of access to their funds. Rather, they have sustained an inconvenience and a headache, which I do not dispute can be of serious proportions. To the extent the account holders' inconvenience can be monetized in the form of lost vacation days, phone calls and letters to the bank and credit reporting agencies, unreimbursed expenses for replacement checks and so on, then I agree that the account holders have sustained a reasonably foreseeable, actual pecuniary loss that is sufficient to count them as "victims" under the Guidelines. *See United States v. Abiodun*, No. 06-5335CR, ___ F.3d ___, 2008 WL 2924341 at *6 (2d Cir. July 30, 2008) (holding that reimbursed account holders may be "victims" under § 2B1.1 based on "loss of time" that can be measured in monetary terms). This is what I understand to be the holding of Part III.B of the opinion, which I fully join. To label the temporary deprivation of access to funds *alone* an "actual loss," however, goes beyond the Guidelines' clear — and narrow — definition of what makes someone a "victim" under § 2B1.1(b)(2).

Moreover, I am concerned that the majority's definition of "actual loss" in Part III.A risks double-counting both the number of victims and the amount of loss caused by the defendant. "Impermissible double counting occurs where one part of the Guidelines is applied to increase a defendant's punishment on

account of a kind of harm that has already been fully accounted for by the application of another part of the Guidelines." *United States v. Thornton*, 511 F.3d 1221, 1227-28 (9th Cir. 2008) (internal quotation marks omitted). The majority's definition of "actual loss" means that both the account holder *and* the bank could be counted as "victims" based on the same harm, the pecuniary loss from the theft of funds. The majority acknowledges that this case differs from cases such as *Thornton* and *United States v. Holt*, 510 F.3d 1007, 1011-12 (9th Cir. 2007), where we upheld sentencing enhancements against double-counting challenges because the defendant's sentence was enhanced under *different* guidelines that captured *different* aspects of the defendant's harm. Here the majority proposes that a single harm — the pecuniary loss from the funds — constitutes an "actual loss" to two different parties under the *same* Guideline, simply because some time elapsed before one party agreed to absorb the loss. The pecuniary loss from the stolen funds, however, is fully absorbed by the bank. By also counting the account holder as a victim, the majority would either be double-counting the victims of the pecuniary loss, or else accounting for some other, non-pecuniary harm to the account holder, which is not permitted by the Guidelines.

More troubling is what this might mean in future cases for the calculation of the loss amount for purposes of a sentencing enhancement under § 2B1.1(b)(1). If both the bank and the account holder, as the majority suggests, sustained an "actual loss" as a result of the theft of funds, then it is not clear why the amount stolen should not also be doubled for purposes of calculating a sentencing enhancement for the loss amount. Thus, under the majority's rationale, a defendant who defrauded a bank of $500,000 could seemingly be punished as if he had stolen $1,000,000 — netting a two-level enhancement — because he would have caused $500,000 in "actual loss" to the bank and another $500,000 in "actual loss" to the account holders. *See* U.S.S.G. § 2B1.1(b)(1). The majority points out that such double-counting is not implicated in

Pham's case because the government stipulated to the loss amount. *See* Maj. Op. at 13394-95. This will not, of course, necessarily be so in future cases. This leads to the troubling proposition that defendants who steal by identity theft could be exposed to significantly higher punishments because the "actual loss" amount would be doubled, at least in cases where the bank understandably takes some time to verify that fraud occurred before agreeing to absorb the loss.

No other circuit has held that two victims can both be counted under the Guidelines based on the same "actual loss" of funds. In *United States v. Lee*, 427 F.3d 881, 894 (11th Cir. 2005), the Eleventh Circuit rejected a defendant's argument that the losses he caused should not be counted under the Guidelines because the victims managed to recover their stolen property *from the defendant himself*. The *Lee* court properly rejected this argument, which would have rendered a crime "victimless" if the victim recovered his stolen property. *See id.* at 895. Here, however, as in *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005), our task is not to decide whether there was *any* victim who sustained the loss, but to choose between two possible victims. In *Yagar*, the Sixth Circuit suggested in dicta that there "may be situations in which a person could be considered a 'victim' under the Guidelines even though he or she is ultimately reimbursed" by the bank for the lost funds. *Id.* at 971. The Sixth Circuit did not explain how or why such a person could be considered a victim, nor explain what actual losses would have to be shown to make such a person a victim. The Sixth Circuit may well have simply anticipated our reasoning in Part III.B, in which I concur, which holds that unreimbursed collateral expenses incurred by the account holders could be sufficient to render these individuals "victims" under the Guidelines. In any event, nothing in the Sixth Circuit's reasoning compels the conclusion that delay prior to reimbursement is *alone* sufficient to render the account holder a "victim" under the Guidelines, absent proof that the delay itself caused independent pecuniary harm.

The majority's holding thus puts this court into tension with other circuits that have interpreted *Yagar* to mean that reimbursed victims of identity theft can be counted as "victims" under § 2B1.1(b)(2) only when the government shows actual pecuniary losses *apart* from the temporary losses that were reimbursed. In *United States v. Abiodun*, 2008 WL 2924341 at *6, the Second Circuit held that reimbursed victims could be counted as "victims" due to the lost time involved in resolving shortfalls in their accounts, but only to the extent that "this 'loss of time' [can] be measured in monetary terms" and the value of the lost time is reflected in the calculation of total loss resulting from the defendants' offenses. Similarly, the Fifth Circuit rejected the suggestion that "account holders are victims because they suffered pecuniary harm at the moment" that stolen funds are charged against their accounts. *See United States v. Conner*, No. 06-50218, ___ F.3d ___, 2008 WL 2876564 at *7 (5th Cir. July 28, 2008). The Fifth Circuit joined the Eighth Circuit in holding that "only the party that '*ultimately*' bore the pecuniary harm from the offense suffered an 'actual loss' " under the Guidelines. *Id.* (quoting *United States v. Icaza*, 492 F.3d 967, 970 (8th Cir. 2007)). Consistent with the Second Circuit and our reasoning in Part III.B, the Fifth Circuit agreed that "[i]t is possible that with a proper evidentiary foundation . . . *unreimbursed* business losses [incurred while seeking reimbursement] could be considered 'actual losses' for the purposes of counting 'victims.' " *Id.* at *8 (emphasis added). No court, however, has endorsed the broad proposition that the majority advances here, which is that mere delay prior to reimbursement — which has not itself been shown to have caused a separate, actual pecuniary loss — is sufficient to make someone a "victim" under the Guidelines.

There is no question that identity theft schemes such as Pham's take a heavy toll on individual account holders, who may spend days or weeks working with the bank to investigate the fraud and restore their account funds, and then spend considerable time dealing with the fallout from their devas-

tated credit histories. If the government can prove that such individuals incurred real, unreimbursed expenses as a foreseeable result of Pham's conduct — even if these pecuniary losses are minimal, but so long as they are monetized — then I agree that Pham's sentence can be enhanced under the Guidelines for his impact on these victims. Further, the district court always may "consider the large number of individual account holders affected by [Pham's] crime as part of its consideration of § 3553(a) factors if the court decided to issue a non-guidelines sentence." *See Conner*, 2008 WL 2876564 at *9. District judges therefore have ample tools to punish defendants for the very real harms they inflict on those whose identities become the vehicles for financial fraud. There is no need for us to create difficult-to-apply rules that would make the number of victims turn on the length of time the bank spent investigating the fraud before reimbursing the account holder, and that risk punishing the defendant twice for causing a single pecuniary harm through his theft of funds. Therefore, I respectfully cannot join the majority's reasoning in Part III.A.