**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael A. RILEY, Defendant–Appellant.**

No. 02–30072.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 2003.

Filed July 9, 2003.

---

Todd L. Greenberg, Assistant United States Attorney, Seattle, WA, for the plaintiff-appellee.

Allen M. Ressler, Browne & Ressler, Seattle, WA, for the defendant-appellant.

Before: WALLACE, TROTT, and TASHIMA, Circuit Judges.

TASHIMA, Circuit Judge.

Michael A. Riley pled guilty to one count of conspiracy to produce fictitious obligations in violation of 18 U.S.C. § 514(a)(2), one count of possession of fictitious obligations in violation of 18 U.S.C. § 514(a)(2), and one count of identification fraud in violation of 18 U.S.C. §§ 1028(a)(5) and (b)(1)(A)(ii). Riley was sentenced to 47 months' imprisonment and now appeals that sentence. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We vacate the sentence and remand for resentencing.

Riley's convictions were based on his participation in a conspiracy to pass fictitious financial instruments. The conspiracy involved the passing of counterfeit and stolen personal and business checks, credit card convenience checks, and money orders. The individuals involved in the scheme included Riley, John Comoza, Timothy Hall, John Motter, Robert Neff, William Walter, and Edward Thaves. The conspiracy entailed removing checks from stolen mail and cashing them using counterfeit identifications. The identifications were created using computers owned by several of the conspiracy members. The stolen checks were also scanned into the computers and used as templates. These templates were used to produce checks under different names but using the same account number. Riley's involvement with this portion of the conspiracy is disputed. He admits that he cashed fraudulent checks on his own, but denies that he was involved in the conspiracy's check cashing activities.

Riley used his computer equipment to create money order templates and introduced the use of money orders to the conspiracy. Riley admitted that he provided the templates to coconspirators along with the identifications they needed to cash the money orders. In addition, a computer disk was seized from his residence that contained false identifications bearing Riley's, Motter's, and Thaves' photos, and images of counterfeit currency and money orders. A CD–ROM containing the same material was later found at Motter's residence.

After Riley pled guilty pursuant to a plea agreement, a pre-sentence report ("PSR") was prepared, using the November 1, 2000, Guidelines Manual, that determined Riley's offense level under United States Sentencing Guideline § 2F1.1. The base offense level under § 2F1.1 is six, but after several enhancements the PSR ultimately determined that Riley's offense level was 24. The PSR calculations placed Riley's criminal history in Category IV. The government concurred with the PSR, with the exception that the government recommended a final offense level of 23.

Riley objected to several of the enhancements and argued that his offense level should be only 10. First, Riley objected to a nine-level enhancement under § 2F1.1(b)(1)(J), which applies when the total intended loss of the defendant's fraudulent conduct is more than $350,000 but less than or equal to $500,000. Riley argued that he should be accountable only for the conspiracy's money order activities and not its check cashing activities. Under Riley's calculation, he would receive only a four-level enhancement based on an intended loss of $30,000. The government in turn suggested an eight-level increase

for an intended loss of between $200,000 and $350,000.

Next, Riley objected to a three-level increase under § 3B1.1(b) for playing a managerial or supervisory role in a criminal activity involving five or more individuals. He argues that, although he did supply money order and identification templates to the conspiracy, he did not organize any activity or exercise any control over other members of the conspiracy.

Riley also objected to a two-level enhancement under § 2F1.1(b)(7)(B) for possession of a firearm in connection with the offense. Although Riley concedes that he possessed a firearm during the conspiracy, he argues that it was not in connection with the conspiracy's fraudulent activities. Riley's counsel stated that Riley owned the gun to protect his family from someone who had threatened his life.

Riley also objected to a two-level enhancement under § 2F1.1(b)(5)(C)(ii) for possession of five or more means of identification. Riley argued that this enhancement requires that the identifications be of actual, as opposed to fictitious, persons.

Riley also argued the he should receive a two-level reduction under § 3E1.1 for acceptance of responsibility. He conceded that he was subject to a two-level enhancement under § 2F1.1(b)(2) for more than minimal planning. Finally, Riley argued that he fell into criminal history category II, instead of category IV.

At an evidentiary hearing, the government presented the testimony of Postal Inspector William Terry and King County Sheriff's Office Detective Michael Klokow, and introduced nine exhibits. Riley presented no evidence at the hearing.

The government calculated the amount of loss attributable to Riley based on the loss intended by the conspiracy as indicated by uncashed checks and money orders found in the conspirators' possession. The intended loss was determined by taking the number of checks and money orders found in the possession of Riley and his co-defendants and multiplying that number by the average actual loss caused by the checks and money orders that had actually been cashed.

The cashed money orders were found to have produced an average loss of $486.71. Twenty-four uncashed money orders were seized from Riley's residence, producing a potential loss of $11,600.71. Nineteen uncashed money orders were seized from Riley's co-defendants, producing additional potential loss of $9,247.49. Riley concedes that this combined loss of $20,848.20 is attributable to him.

Ninety-three uncashed personal checks were found in Riley's residence. The average loss for personal checks, based on actual loss caused by Riley's co-defendants' checks, was found to be $1,908.66, producing a potential loss of $177,505.38. Two hundred and twenty-eight uncashed checks were seized from Riley's co-defendants, producing a potential loss of $435,174.48. Finally, fifty-eight credit card convenience checks were seized from co-defendants. These were determined to have an average loss of $4,400.00, producing a potential loss of $255,200.00.

The government's calculations produced a total potential loss of $888,728.06. The government, however, asked only for an enhancement based on a range of $200,000 to $350,000.

The district court determined that Riley's offense level was 20 by applying each of the enhancements urged by the government, but also reducing the offense level by two for acceptance of responsibility and departing downward by one level on the firearm enhancement because the court felt the circumstances were unusual. In

addition, the district court departed downward to criminal history category III, finding that category IV overstated the seriousness of Riley's criminal history. The court did not expressly address any of Riley's objections regarding his criminal history category. The court imposed a sentence of 47 months' imprisonment. It also ordered restitution in the amount of $34,251.78.

## I SENTENCING ENHANCEMENTS

■ Riley first argues that the district court erred in applying the enhancements he challenged at the sentencing hearing. As a threshold matter, he argues that the district court applied the incorrect standard of proof in determining whether the facts supported those enhancements. Riley contends that the district court should have applied the "clear and convincing evidence" standard, rather than the "preponderance of the evidence" standard. Under the higher standard of proof, he argues, the district court's application of the enhancements was erroneous. In the alternative, Riley argues that even under the lower preponderance standard, the district court's application of the enhancements was erroneous. After we first address the proper standard of proof, we discuss each of the challenged enhancements individually, in light of that standard.

### A. Standard of Proof

At sentencing, Riley did not argue that the clear and convincing standard applied. In fact, in his sentencing memorandum, Riley stated that the preponderance of the evidence standard should apply. Riley now claims that the district court should have required that the contested sentence enhancements be proven by clear and convincing evidence because of the disproportionate impact the enhancements had on

sentencing. He claims that the court's failure to do so constituted plain error.

■ The district court's interpretation of the sentencing guidelines is reviewed de novo. *United States v. Jordan,* 256 F.3d 922, 926 (9th Cir.2001). The factual findings underlying sentencing decisions are reviewed for clear error. *United States v. Williams,* 291 F.3d 1180, 1196 (9th Cir.2002). Because Riley failed to object to the district court's application of the preponderance standard, we review for plain error. Fed.R.Crim.P. 52(b); *see also Jordan,* 256 F.3d at 926. Before an appellate court can correct an error that was not raised at trial "there must be (1) 'error', (2) that is 'plain', and (3) that 'affects substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citations omitted).

■ The first step in the plain error analysis is to determine whether the district court erred by failing to require clear and convincing evidence to prove the disputed sentence enhancements. Generally, factual findings underlying sentence enhancements must be supported by a preponderance of the evidence. *United States v. Munoz,* 233 F.3d 1117, 1126 (9th Cir.2000). When, however, the combined impact of contested sentencing enhancements is disproportionate relative to the offense of conviction, the district court must apply the clear and convincing evidence standard of proof. *Jordan,* 256 F.3d at 927–29. There is no bright-line rule for determining when the clear and convincing evidence standard applies. *Id.* at 928. Instead, we look at the totality of the circum-

stances, examining several factors, none of which is dispositive. *Id.*

In *Jordan*, this court listed six factors that are examined to determine whether the clear and convincing standard applies: (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged; (2) whether the enhanced sentence negates the presumption of innocence for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether the increase in the number of offense levels is four or less; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range where the defendant would otherwise have received a relatively short sentence. *Id.*

█ The first three factors do not apply in this case. The fourth factor, whether the increase in sentence is based on the extent of a conspiracy, however, applies to some of the contested enhancements. This factor was derived from the holding in *United States v. Harrison–Philpot,* 978 F.2d 1520, 1523–24 (9th Cir. 1992). *See United States v. Valensia,* 222 F.3d 1173, 1182 (9th Cir.2000), *vacated,* 532 U.S. 901, 121 S.Ct. 1222, 149 L.Ed.2d 133 (2001). The challenged enhancement in *Harrison–Philpot* was the amount of drugs distributed by a conspiracy. The court noted that the defendant in that case "was charged and convicted of conspiracy; the extent of the conspiracy caused the tremendous increase in her sentence." *Harrison–Philpot,* 978 F.2d at 1523. Therefore the enhancement was "on a fundamentally different plane than" an enhancement based on uncharged conduct, and the court declined to apply the clear and convincing standard, even though the enhancement in that case increased the defendant's sentencing range from 41–51 months to 292–365 months. *Id.* The fact that an enhancement is based on the extent of a conspiracy for which the defendant was convicted weighs heavily against the application of the clear and convincing evidence standard of proof. *See United States v. Johansson,* 249 F.3d 848, 855, 857 (9th Cir.2001) (holding that the fact that defendant's "offense level was increased because of the nature and extent of the offense to which he pled guilty, rather than for acquitted or uncharged crimes" weighed against application of clear and convincing standard); *Cf. Munoz,* 233 F.3d at 1127 (requiring clear and convincing evidence for amount of loss under § 2F1.1, when the enhancement was based on uncharged conduct).

In this case, two of the challenged enhancements fall within the scope of this factor. The enhancement under § 2F1.1(b)(1) is based entirely on the extent of the conspiracy to which Riley pled guilty. Riley pled guilty to conspiracy to produce counterfeit instruments with intent to defraud; this enhancement only determined how much loss the conspiracy intended to inflict using those instruments. Like the drug amount enhancement in *Harrison–Philpot,* this enhancement is based on the extent of the conduct to which Riley pled guilty (the amount of loss intended by the conspiracy's fraud), and is on "a fundamentally different plane" than those enhancements based on conduct for which the defendant was not convicted. *Harrison–Philpot,* 978 F.2d at 1523; *see also United States v. Rosacker,* 314 F.3d 422, 430 (9th Cir.2002) (holding that drug amount enhancement is "on a fundamentally different plane" than other enhancements and applying only the preponderance of the evidence standard).

Likewise, the enhancement under § 2F1.1(b)(5)(C)(ii), for possession of five or more means of identification, is also based on the extent of the conspiracy to which Riley pled guilty. The conspiracy depended on the production of false identifications to perpetrate its frauds and Riley pled guilty to identification fraud. The number of identifications used in this fraud is analogous to the drug amount enhancements in *Harrison–Philpot* and *Rosacker.* In both cases, there is no question that the defendant was convicted of the underlying activity, only the extent of that activity is disputed. Riley pled guilty to identification fraud and the only dispute was how many fraudulent pieces of identification he could be held responsible for. Once again, this fact places this enhancement on "a fundamentally different plane" than those enhancements based on conduct for which the defendant was not convicted. *Harrison–Philpot,* 978 F.2d at 1523.

With that in mind, an examination of the fifth and sixth *Jordan* factors indicates that the district court did not err in applying the preponderance of the evidence standard. Although all of the challenged enhancements, taken together, increased Riley's offense level by 10 [1], six of those levels were based on the extent of the conspiracy to which Riley pled guilty. Excluding those enhancements, the remaining enhancements only increased Riley's offense level by four. Likewise, although all of the contested enhancements increased Riley's sentencing range from 10–16 months to 41–51 months, the majority of the increase was the result of the en-hancements based on the extent of the conspiracy. Riley's sentencing range under the uncontested enhancements and those enhancements based on the extent of the conspiracy was 27–33 months. Even if Riley had been placed in criminal history category II, as he argues he should have been, his sentencing range under those enhancements would have been 24–30 months. The remaining contested enhancements did not more than double Riley's sentencing range. Because the contested enhancements that were not based on the extent of the conspiracy to which Riley pled guilty did not increase Riley's offense level by more than four or more than double his sentencing range, they did not have an extremely disproportionate effect on the sentence relative to the offense of conviction. Although the enhancements that were based on the extent of the conspiracy further increased the sentence, such increase was based on the magnitude of the conspiracy to which Riley pled guilty and was not disproportionate relative to the offense of conviction. For these reasons, the district court did not err in applying the preponderance of the evidence standard and thus there was no plain error.[2]

### B. Amount of Loss

■ Riley challenges the eight-level increase in his offense level pursuant to U.S.S.G. § 2F1.1(b)(1)(I) for an amount of loss of $200,000–350,000. In the main, he contests the district court's inclusion of the conspiracy's check cashing activities in de-

---

1. The challenged enhancements consist of: (a) four levels for the difference in the amount of loss claimed by the parties under § 2F1.1(b)(1); (b) the two-level enhancement for having five or more means of identifications under § 2F1.1(b)(5)(C)(ii); (c) the adjusted one-level enhancement for possession of a firearm under § 2F1.1(b)(7)(B); and (d)

the three-level enhancement for playing an aggravated role under § 3B1.1(b).

2. Because we hold that the district court did not err in applying the preponderance of the evidence standard, we need not address the remaining factors of the plain error test.

termining the amount of loss attributable to him.

■ Riley first argues that the district court did not make factual findings regarding the scope of his participation in the conspiracy. Under § 1B1.3(a)(1)(B), the relevant conduct for a conspiracy consists of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." The scope of the jointly undertaken activity "is not necessarily the same as the scope of the entire conspiracy." U.S.S.G. § 1B1.3, Application Note 2. Each conspirator is responsible only for the activities that fell within the scope of his particular agreement with the conspirators, and reasonably foreseeable behavior in furtherance of that particular agreement. *See United States v. Whitecotton*, 142 F.3d 1194, 1198–99 (9th Cir.1998). When determining a conspirator's relevant conduct under this section "the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." *Id.* at 1197.

■ As Riley suggests, the district court did not expressly determine the scope of Riley's participation. The court did, however, adopt the factual findings of the PSR. A district court may adopt the factual findings in a PSR, if sufficient, to determine a conspirator's scope of participation in the conspiracy. *Id.* at 1198. The PSR states that "Riley used his computer and lamination equipment to produce multiple fraudulent Washington State Driver's Licenses, fictitious personal and business checks and money orders, counterfeit currency, and other identifications for himself and others." This statement is

an explicit, sufficient factual finding that Riley participated in the check cashing activities of the conspiracy.

■ Riley next argues that there was insufficient evidence to support the $200,000–350,000 amount of loss ·the district court found was attributable to Riley. We disagree.

There is ample evidence showing that Riley participated in the conspiracy's check-cashing activities. First, Riley admitted in his plea agreement that he produced "multiple fraudulent Washington State driver's licenses and other I.D., fictitious personal and business checks and money orders, and counterfeit currency for himself and others," and that he "provided templates for false identifications and checks to an unindicted co-conspirator who used the templates to produce false checks and identifications." Moreover, Riley was arrested while attempting to pass a fraudulent check with Thaves, another member of the conspiracy, and Riley was in possession of a check in the name Robert Donner, while Neff and Comoza were arrested with a false Donner identification.[3]

Once the check-cashing activities of his co-conspirators are taken into account, the amount of loss that could have been attributed to Riley far exceeds $200,000. Even without the checks in the possession of his co-conspirators, the amount of loss attributable to Riley is $198,353.[4] The projected loss, based on the average actual loss caused by checks cashed by his co-conspirators, for each check was $1,908. Thus, if Riley was held accountable for even one of the 228 checks seized from his co-conspira-

---

**3.** The finding is also supported by the plea agreements of Hall, Motter, and Neff, all stating that Riley, along with others, "produced fraudulent identifications, checks and money orders."

**4.** The $177,505 projected loss from checks found at Riley's residence, plus the $20,848 projected loss from the money orders, totals $198,353.

tors, the amount attributable to Riley would exceed the $200,000 mark.

Because the preponderance of the evidence supports findings that (1) Riley was involved in the check cashing activities of his co-conspirators, and (2) the amount of loss attributable to Riley through his co-conspirators' activities exceeded $200,000, the district court did not err in applying an eight-level enhancement.[5]

## C. Aggravated Role

 Riley next argues that there was not sufficient evidence to support the three level enhancement under § 3B1.1(b), for holding the role of a manager or supervisor in the conspiracy. To sustain a finding that a defendant played an aggravated role under § 3B1.1, "there must be evidence that the defendant 'exercised some control over others involved in commission of the offense [or was] responsible for organizing others for the purpose of carrying out the crime.'" *United States v. Harper*, 33 F.3d 1143, 1151 (9th Cir.1994) (quoting *United States v. Mares–Molina*, 913 F.2d 770, 773 (9th Cir.1990)). A defendant "need only exercise authority over one and not all of the other participants in order to merit the adjustment." *United States v. Camper*, 66 F.3d 229, 231 (9th Cir.1995).

Riley argues that the evidence only showed that he introduced the conspiracy to the use of counterfeit money orders, not that he played any managerial or supervisory role. The district court held that this enhancement was proper under *Camper*, in which this court upheld the application of the aggravated role enhancement to a defendant convicted of trafficking in counterfeit credit cards. In that case, the district court found, based on the factual stipulations contained in a co-defendant's plea agreement, that Camper gave counterfeit credit cards to another member of the conspiracy, who would use them to obtain cash advances and then split the money with Camper. *Id.* at 231–32. In addition, a search of Camper's belongings uncovered the instrumentalities of credit card counterfeiting. *Id.* at 232.

Riley's case is virtually indistinguishable from *Camper*. The district court adopted the PSR which found, based on Riley's plea agreement and the plea agreements of several of his co-defendants, that Riley had produced counterfeit money orders for his coconspirators, who would then cash them and give Riley a share of the profits. Furthermore, the instrumentalities for creating counterfeit money orders were found in Riley's home. These facts were sufficient for the district court to conclude by a preponderance of the evidence that Riley exercised a managerial role in the money order portion of the scheme. *See Camper*, 66 F.3d at 232.

## D. Possession of Firearm

 Riley next claims that the enhancement for possession of a firearm in

---

**5.** Riley also argues that it was improper for the court to include 14 checks passed by the conspiracy before he claims to have joined it in calculating the average actual loss caused by the conspiracy for purposes of calculating the intended loss. This inclusion was proper because, even if the checks were passed before Riley joined the conspiracy, they were still illustrative of the level of fraud conducted by the conspiracy and were a sufficiently reliable predictor of its future intended activities. The loss caused by these checks was not add-ed to Riley's total intended loss, but was used only to determine the average intended loss caused by checks passed by the conspiracy. In any event, any error was harmless because the district court was very conservative in its estimates, reducing the intended loss from the $888,728.06 calculated by the government to a loss of between $200,000˙ and $350,000. Thus, any inflation of the average loss caused by these 14 checks was more than offset by this drastic reduction.

connection with this crime is not sufficiently supported by the evidence. Riley concedes that he possessed a firearm, but contests whether it was "in connection" with the conspiracy. Under similar weapon possession enhancements, the Ninth Circuit has construed the phrase "in connection with" as meaning "possessed in a manner that permits an inference that it facilitated or potentially facilitated—i.e. had some potential emboldening role in—a defendant's felonious conduct." *United States v. Ellis*, 241 F.3d 1096, 1099 (9th Cir.2001) (quoting *United States v. Routon*, 25 F.3d 815, 819 (9th Cir.1994)).

The district court did not clearly err in holding that Riley possessed this gun in connection with the conspiracy. The pistol was found in a plastic folder that also contained blank check stock and false identifications, items that were closely associated with the activity of the conspiracy. During the evidentiary hearing Postal Inspector Terry stated that he had been told by two confidential informants, Jay Sauvage and Kathy Heinmiller, that Riley carried the gun for protection. Sauvage stated that Riley carried the gun whenever he visited the other conspirators to deliver counterfeit money orders. This evidence was sufficient for the district court to determine that Riley carried the gun in connection with the conspiracy by a preponderance of the evidence. Riley's claim that he carried the gun to protect himself from a threat unrelated to the conspiracy was based only on assertions by his counsel and was unsupported by any evidence. The district court did not err in applying the one-level enhancement for carrying a firearm.

### E. Five or More Means of Identification

■■■■ Riley next claims that there was insufficient evidence to support an enhancement under § 2F1.1(b)(5)(C)(ii), based on a finding that he possessed five or more means of false identification. In order to trigger this enhancement, the five pieces of identification must be of actual, as opposed to fictitious, individuals. U.S.S.G. § 2F1.1, Application Note 15. At the evidentiary hearing, Postal Inspector Terry testified that "some of the names" on the identifications found in Riley's home were of actual people and "some were not." He also testified that he could not remember "which were real and which may have been false." The government presented no evidence showing how many of the seized identifications were of actual people. Thus, the evidence does not support a finding that Riley possessed false identifications of at least five actual people, and the district court clearly erred in applying the enhancement. Riley's sentence must therefore be vacated and the case remanded for resentencing.[6]

---

**6.** At oral argument, the government argued for the first time that this enhancement was proper because the term "means of identification," as used in § 2F1.1(b)(5)(C)(ii), encompasses not only photo identification, but also bank account numbers. Because it was first raised at oral argument, this argument is waived on appeal and we do not consider it. *Wood v. Hall*, 130 F.3d 373, 377 (9th Cir. 1997). Moreover, the record is clear that the application of this enhancement was based on Riley's possession of false driver's licenses, not bank account numbers. On remand, we leave it to the district court's discretion whether to allow the government to seek an enhancement based on the possession of illegally obtained bank account numbers. *See United States v. Matthews*, 278 F.3d 880, 885–86 (9th Cir.) (en banc) (holding that on remand "the district court generally should be free to consider any matters relevant to sentencing, even those that may not have been raised at the first sentencing hearing, as if it were sentencing de novo"), *cert. denied*, 535 U.S. 1120, 122 S.Ct. 2345, 153 L.Ed.2d 173 (2002).

## II CRIMINAL HISTORY POINTS

Riley also contends that his sentence must be vacated and remanded because the court failed to rule on several objections to the criminal history points assigned to him by the PSR. Riley objected to the report's finding that he had committed the crime while on probation and that the offense was committed within two years of Riley's release from prison.

Federal Rule of Criminal Procedure 32 requires that the court rule on any unresolved objections to the PSR at the sentencing hearing. *United States v. Herrera–Rojas*, 243 F.3d 1139, 1142 (9th Cir.2001). "For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." *Id.* "If the district court fails to make the required Rule 32 findings or determinations at the time of sentencing, the sentence must be vacated and the defendant resentenced." *Id.* (quoting *United States v. Gutierrez–Hernandez*, 94 F.3d 582, 584 (9th Cir.1996)).

The district court did not expressly address Riley's objections to his criminal history during the sentencing hearing. Instead, the court simply stated that Riley had "more than nine points," placing him in Category IV. The court then decided to treat him as Category III because the bulk of the history points came from driving offenses. Although the court did not specifically address Riley's objections to the criminal history calculation, the court later adopted the recommendations and findings of fact of the PSR. This is sufficient to satisfy Rule 32. *United States v. Tam*, 240 F.3d 797, 803–04 (9th Cir.2001).

Riley also argues that the disputed criminal history points were unsupported by the record. He argues that the two criminal history points added under § 4A1.1(d), for committing the instant offense while on probation, was incorrect because his probation ended on January 26, 2001, and he claims that he did not join the conspiracy until "Spring 2001." Evidence was presented, however, that indicated that Riley had begun working with other members of the conspiracy as early as November 2000. The district court did not err in adding these two criminal history points.

Riley also contends that the addition of one point under § 4A1.1(e), for committing the instant offense within two years after release from imprisonment was improper. He asserts that he was released from imprisonment in January 1998, rather than January 1999, as shown by the PSR. No contrary evidence was produced, however, to challenge the PSR's findings and an uncontradicted PSR alone is sufficient to uphold a district court's findings. *See United States v. Romero–Rendon*, 220 F.3d 1159, 1165 (9th Cir.2000).

## III RESTITUTION

Finally, Riley challenges the district court's restitution order. He contends that he should not be held accountable for the losses caused by his coconspirators' check cashing. He bases this claim on the same arguments that he used to challenge his sentencing enhancement based on his involvement with his coconspirators' check cashing.

A restitution order is reviewed for abuse of discretion if it is within the bounds of the statutory framework. *United States v. Booth*, 309 F.3d 566, 575 n. 6 (9th Cir.2002). This restitution order was issued pursuant to 18 U.S.C. § 3663A. Under § 3663A, in a case involving a conspiracy or scheme, restitution may be ordered for all persons harmed by the entire scheme. *Booth*, 309 F.3d at 576. Restitu-

tion is not confined to the harm caused by the particular offenses to which Riley pleaded guilty. *Id.* A conspirator is vicariously liable for reasonably foreseeable substantive crimes committed by a coconspirator in furtherance of the conspiracy. *United States v. Fonseca-Caro,* 114 F.3d 906, 907 (9th Cir.1997). Because, as discussed above, the check cashing activities of the conspiracy are properly attributed to Riley, the district court did not abuse its discretion by requiring Riley to pay restitution for checks passed by his coconspirators.

## CONCLUSION

Even though we hold that the district court correctly applied the preponderance of the evidence standard and we affirm the district court on all but one of the issues raised, we must vacate the sentence and remand for resentencing because the evidence did not support the enhancement for possessing five or more means of false identification.

**VACATED and REMANDED.**