**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

WARREN ERIC ARMSTEAD,
*Defendant-Appellant.*

No. 06-30550

D.C. No.
CR 04-0512 JLR

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
April 8, 2008—Seattle, Washington

Filed October 15, 2008
Opinion Withdrawn and Amended Opinion
Filed December 30, 2008

Before: Stephen Reinhardt, A. Wallace Tashima, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge Tashima

16779

## COUNSEL

Tessa M. Gorman, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

Carol A. Elewski, Tumwater, Washington, for the defendant-appellant.

## ORDER

The Opinion filed October 15, 2008, and reported at 546 F.3d 1097, is withdrawn and replaced by the Amended Opinion filed concurrently with this order. With the filing of the Amended Opinion, the panel has voted to deny the petition for panel rehearing. Judges Reinhardt and McKeown vote to deny the petition for rehearing en banc and Judge Tashima so recommends. The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on en banc rehearing. *See* Fed. R. App. P. 35(f).

The petition for panel rehearing and the petition for rehearing en banc are denied. No further petitions for rehearing may be filed.

## OPINION

TASHIMA, Circuit Judge:

A jury convicted Defendant Warren Armstead of nine counts of bank fraud in violation of 18 U.S.C. § 1344 and one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349. On appeal, Armstead contends that the district court committed numerous procedural errors during sentencing and that his 210-month sentence is substantively unreasonable.[1] Because we agree that the district court miscalculated the number of victims under United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(b)(2) and erred under U.S.S.G. § 5G1.3(b)(1), we vacate Armstead's sentence and remand for resentencing.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

From 2001 to 2004, Armstead led a conspiracy to commit bank fraud. Armstead recruited conspirators and paid them fifty dollars or gave them drugs in exchange for "packets" of stolen personal information. Each packet contained an individual's social security number, a bank account number or numbers, a credit card number or numbers, and blank checks. Armstead and his co-conspirators stole these packets from individuals, their homes, and vehicles.

Armstead gave the personal identification information to certain co-conspirators and directed them to create fake Washington State Driver Licenses ("WSDLs"). Each fake WSDL contained stolen personal information juxtaposed with a photograph of one of the conspirators. At Armstead's direction, his co-conspirators deposited stolen checks into bank accounts and withdrew funds from those accounts using the

---

[1]Armstead's challenge to his conviction was addressed and his conviction affirmed in a memorandum disposition, filed on October 15, 2008. *See United States v. Armstead*, 2008 WL 4613637.

fake WSDLs. Conspirators also used the fake WSDLs to take out lines of credit with General Electric ("GE"), Home Depot, and Dania Furniture and to purchase merchandise with that credit. Armstead received fifty percent of all of the proceeds from the fraudulent schemes.

Armstead was charged with nine counts of bank fraud under 18 U.S.C. § 1344 and one count of conspiracy to commit bank fraud under 18 U.S.C. § 1349. Armstead's nine co-conspirators pled guilty and they, as well as individuals from whom his co-conspirators stole personal information, testified against Armstead at his trial. In submitting the case to the jury, at Armstead's request, the district court included on the verdict form the following interrogatory: "Was the defendant WARREN ERIC ARMSTEAD an organizer or leader of a conspiracy or a bank fraud scheme that involved five or more participants or was otherwise extensive?" The jury returned a guilty verdict on all ten counts and answered the interrogatory in the affirmative.

Armstead's presentence investigation report ("PSR") recommended a minimum $397,000 loss amount. This amount included $296,000 from a United States Secret Service loss calculation (the "Secret Service calculation"); $50,000 in cash that Armstead gave Rusty Hill, one of Armstead's co-conspirators; $46,000 that an individual testified was taken from her bank account; and $5,000 in loss to Dania Furniture. The Secret Service calculation was based on amounts conspirators took from forty-two accounts at thirteen banks and credit unions (collectively, the "banks"). These forty-two accounts belonged to forty-six different individuals and businesses. The Secret Service calculation also included $11,576.88 in losses to GE and Home Depot.

At sentencing the government argued that the loss amount should also include $107,000 based on deposits made to Armstead's bank account during the course of the conspiracy. Armstead argued that the loss calculation should not include

any of the $107,000 or the $50,000 Armstead gave to Hill. Armstead further contended that the number of victims should be limited to the number of banks — thirteen[2] — and that the district court should not apply the enhancement for role in the offense. With regard to the 18 U.S.C. § 3553(a) factors, Armstead argued that his sentence should be comparable to that of his co-conspirators.[3]

The district court agreed with the loss calculation in the PSR,[4] but also added enough from the $107,000 in deposits to Armstead's bank account to bring the total loss amount over $400,000. The court stated that it was "extremely skeptical of counting 100 percent of the funds," but concluded that enough of the funds came from criminal conduct to cross the $400,000 threshold. The district court also found that there were more than fifty victims and, having submitted the question of Armstead's role in the offense to the jury, adopted its finding that Armstead was a leader or organizer in the conspiracy. The district court calculated the Guidelines range for Armstead's sentence as follows:

---

[2]In his sentencing memorandum, Armstead argued that the number of victims should be limited to seven, the number of banks in the indictment. On the day of sentencing and before this court, however, Armstead argued that the victims should be limited to the number of banks, but did not dispute the government's list of thirteen bank victims in the Secret Service calculation.

[3]The co-conspirator with the longest sentence received a 60-month term of imprisonment.

[4]On the day of sentencing, the government presented a slightly revised Secret Service calculation and a slightly revised amount of loss attributable to Dania Furniture. The district court, however, adopted the Secret Service calculation and loss attributed to Dania Furniture as listed in the PSR: $296,000 and $5,000, respectively. Because the parties do not argue that the district court erred in doing so, we use the amounts listed in the PSR throughout.

| | |
|---|---|
| Base offense level (U.S.S.G. § 2B1.1(a)(1)): | 7 |
| Loss amount over $400,000 (U.S.S.G. § 2B1.1(b)(1)(H)): | +14 |
| Fifty or more victims (U.S.S.G. § 2B1.1(b)(2)(B)): | +4 |
| Possession of five or more false identifications (U.S.S.G. § 2B1.1(b)(10)): | +2 |
| Adjustment for role in the offense (U.S.S.G. § 3B1.1(a)): | +4 |
| Total offense level: | 31 |
| Criminal history category: | V |
| Guidelines range: | 168-210 months |

After calculating the Guidelines range, the district court considered the 18 U.S.C. § 3553(a) factors and sentenced Armstead to a 210-month term of imprisonment, the top of the Guidelines range. The district court did not credit Armstead for the five months he had already served on an undischarged state sentence. Armstead timely appeals.

## II. ANALYSIS

### A. Standards of Review

When reviewing a sentence, "we first consider whether the district court committed significant procedural error." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc) (citing *Gall v. United States*, 128 S. Ct. 586, 597 (2007)). Procedural errors include, but are not limited to, incorrectly calculating the Guidelines range, treating the Guidelines as mandatory, failing properly to consider the § 3553(a) factors,

using clearly erroneous facts when calculating the Guidelines range or determining the sentence, and failing to provide an adequate explanation for the sentence imposed. *Id.* "We review the district court's interpretation of the Sentencing Guidelines *de novo*, the district court's application of the Guidelines to the facts for abuse of discretion, and the district court's factual findings for clear error." *United States v. Garro*, 517 F.3d 1163, 1167 (9th Cir. 2008) (citing *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006)).

If we discern no significant procedural error, we proceed to the second step and "consider the substantive reasonableness of the sentence." *Carty*, 520 F.3d at 993 (citing *Gall*, 128 S. Ct. at 597). We review the substantive reasonableness of a sentence for abuse of discretion. *Gall*, 128 S. Ct. at 597; *Carty*, 520 F.3d at 993.

## B.   Standard of Proof

A district court generally uses a preponderance of the evidence standard of proof when finding facts at sentencing. *United States v. Moreland*, 509 F.3d 1201, 1220 (9th Cir. 2007) (citing *United States v. Kilby*, 443 F.3d 1135, 1140 (9th Cir. 2006)). Only " 'when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction' " must a district court find the facts by a clear and convincing standard of proof. *Id.* (quoting *United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005)).

Because Armstead did not object to the standard of proof below, we review for plain error. Fed. R. Crim. P. 52(b); *see also United States v. Rendon-Duarte*, 490 F.3d 1142, 1146 (9th Cir. 2007). For an error to be plain, it must be (1) an "error," (2) that is "plain," and (3) that "affects substantial rights." *Id.* (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)). Moreover, we will not exercise our discretion to correct the error " 'unless the error seriously affect[s] the fair-

ness, integrity or public reputation of judicial proceedings.' " *Id.* (alteration in original) (quoting *Olano*, 507 U.S. at 732).

Armstead contends that the district court should have employed the clear and convincing standard of proof because enhancements[5] for the amount of loss under § 2B1.1(b)(1) (two levels),[6] number of victims under § 2B1.1(b)(2) (two levels),[7] and role in the offense under § 3B1.1 (four levels) had a disproportionate effect on his sentence. Without the disputed enhancements, Armstead's total offense level would have been twenty-three instead of thirty-one, and his Guidelines range (using Criminal History Category V) would have been 84-105 months, instead of 168-210 months.

**[1]** Armstead's argument fails for three reasons. First, the district court did not err by finding the number of victims by a preponderance of the evidence because sentencing enhancements based entirely on the extent of the conspiracy do not require the heightened standard of proof. *See Riley*, 335 F.3d at 926-27 (holding that enhancements for loss amount and possession of five or more means of false identification were

---

[5]In *United States v. Harrison-Philpot*, we used the term "enhancement" to describe an increase in offense level based on uncharged or acquitted conduct. 978 F.2d 1520, 1524 (9th Cir. 1992) (contrasting "sentencing enhancement" with "straight sentencing for convicted conduct"). Here, we use the term "enhancement" to describe any addition to the base offense level. *See United States v. Riley*, 335 F.3d 919, 926 (9th Cir. 2003) (using "enhancements" to describe increases to the base offense level based on the extent of a conspiracy).

[6]In his sentencing memorandum, Armstead argued that the amount of loss should be limited to the amount in the indictment: $13,000. At the sentencing hearing and before this court, however, Armstead disputed only $173,576.88 of the total loss. Without the disputed amount, the loss calculation would be over $200,000 instead of over $400,000, resulting in a 12-level rather than a 14-level increase. *See* U.S.S.G. § 2B1.1(b)(1)(G),(H).

[7]The Guidelines direct a two-level increase for over ten victims and a four-level increase for fifty or more victims. U.S.S.G. § 2B1.1(b)(2)(A),(B).

based on the extent of the conspiracy to produce fictitious obligations and thus did not have a "disproportionate effect on the sentence relative to the offense of conviction"); *Harrison-Philpot*, 978 F.2d at 1524 (holding that the quantity of drugs in a conspiracy need only be established by a preponderance of the evidence). Enhancements based on the extent of a conspiracy are " 'on a fundamentally different plane than' " enhancements based on uncharged or acquitted conduct. *Riley*, 335 F.3d at 926 (quoting *Harrison-Philpot*, 978 F.2d at 1523). Due process concerns with regard to the former are satisfied by a preponderance of the evidence standard because the enhancements are based on criminal activity for which the defendant has already been convicted. *Harrison-Philpot*, 978 F.2d at 1523.

[2] Second, the jury found that Armstead was a leader or organizer of the conspiracy beyond a reasonable doubt, a higher standard of proof than the clear and convincing evidence standard. By adopting the jury's finding, the district court agreed that the government proved beyond a reasonable doubt that Armstead was a leader or organizer of the conspiracy.[8] We thus conclude that the standard of proof argument is inapplicable to the four-level enhancement for role in the offense.

[3] Finally, the remaining two-level enhancement due to the disputed amount of loss did not have an " 'extremely disproportionate effect' " on the sentence.[9] *Moreland*, 509 F.3d

---

[8]Armstead further contends that the district court should not have adopted the jury's finding that Armstead was a leader or organizer in the conspiracy because the jury was not instructed on how the Guidelines define those terms. It is the district court's decision to apply the enhancement, however, that we review on appeal. Given the prodigious evidence presented at trial detailing Armstead's role in the conspiracy, and particularly the testimony from co-conspirators that Armstead recruited them, directed their actions, and collected fifty percent of their proceeds, we cannot say that the district court abused its discretion when applying the four-level enhancement for Armstead's role in the conspiracy.

[9]While the vast majority of the loss amount is attributable to the extent of the conspiracy, a fraction of the loss amount — $16,576.88 — relates

at 1220 (quoting *Dare*, 425 F.3d at 642); *see also United States v. Watts*, 519 U.S. 148, 150, 156-57 (1997) (noting that a two-level enhancement is not an "exceptional circumstance[ ]" that could warrant a higher standard of proof). Accordingly, we hold that the district court did not err by applying a preponderance of the evidence standard to its enhancement findings.[10]

## C.   Loss Calculation Pursuant to U.S.S.G. § 2B1.1(b)(1)

When calculating the Guidelines range for bank fraud, a district court must determine the amount of loss caused by the fraud. U.S.S.G. § 2B1.1(b)(1). The Guidelines further direct that "[t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, cmt. n.3(C). We defer to the district court's calculation because "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." *Id.*

Armstead contends that the district court erred by including the following in its loss calculation: $107,000 in deposits to his bank account; $50,000 that Hill testified Armstead gave to him; and $16,576.88 in loss attributable to retail fraud.

[4] Armstead first argues that gain cannot be used as a measure of loss when a court also uses actual loss in its calculations. The $107,000 in deposits to Armstead's bank account and the $50,000 that Armstead gave to Hill are better characterized as gain. The Guidelines direct the court to "use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be deter-

---

to retail fraud, which was uncharged conduct. Assuming that the district court only found the minimum amount of loss necessary to cross the $400,000 threshold, a two-level enhancement may be attributed to the retail fraud loss amount.

[10]Finding no error, we need not address the remaining factors in the plain error analysis.

mined." U.S.S.G. § 2B1.1, cmt. n.3(B). This note provides that it is only appropriate to use gain as an *exclusive* measure of loss when actual loss cannot be determined. We do not read the note, however, to prohibit the use of gain as a proxy for a *portion* of the total loss where some, but not all, of the loss can be determined.

**[5]** Here, the district court used actual loss to estimate the vast majority of the total: approximately $347,000. The district court found, however, that this loss calculation did not properly account for all of the loss caused by the conspiracy and used a small portion of Armstead's gain to account for a small portion of the loss. The nature of Armstead's crime, where money was fraudulently withdrawn from bank accounts, lends itself to this type of approximation because, as the district court reasonably determined, some of the money going into Armstead's account and the money Armstead gave to Hill corresponded dollar-for-dollar with money lost by the banks. Given that a court need only make a "reasonable estimate of the loss," the district court's method of calculation is not foreclosed by the Guidelines.

Armstead next argues that the district court erred by including $16,576.88 in loss attributable to retail fraud. Armstead concedes that this amount can be included if the retail fraud is relevant conduct under U.S.S.G. § 1B1.3(a)(1)-(2), but he maintains that it is not. Because Armstead did not object to the loss calculation on this basis at sentencing, we review for plain error. *See Rendon-Duarte*, 490 F.3d at 1146.

**[6]** Specific offense characteristics, such as loss, are determined by taking into account:

> (1)  (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and (B) in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and

omissions of others in furtherance of the jointly
undertaken criminal activity,
that occurred during the commission of the
offense of conviction . . . ;

(2) . . . all acts and omissions described in subdivi-
sions (1)(A) and (1)(B) above that were part of the
same course of conduct or common scheme or plan
as the offense of conviction.

U.S.S.G. § 1B1.3(a)(1)-(2). Acts are part of the same course
of conduct "if they are sufficiently connected or related to
each other as to warrant the conclusion that they are part of
a single episode, spree, or ongoing series of offenses."
U.S.S.G. § 1B1.3, cmt. n.9(B). Acts are part of the common
scheme or plan if they are "substantially connected to [the
offense] by at least one common factor, such as common vic-
tims, common accomplices, common purpose, or similar
modus operandi." U.S.S.G. § 1B1.3, cmt. n.9(A).

**[7]** The fraud perpetrated against GE, Home Depot, and
Dania Furniture involved the same co-conspirators using the
same personal identification information that was used to per-
petrate the bank fraud. At sentencing, the government prof-
fered that the Secret Service calculation, which included
losses to GE and Home Depot, accounted for losses associ-
ated with the personal identification information recovered
from Armstead's house, car, and hotel room and identifica-
tions used when conspirators deposited or withdrew money
from the banks. Additionally, Armstead orchestrated the
fraudulent purchase at Dania Furniture in the same manner as
he directed the bank fraud: he told co-conspirators to obtain
credit at Dania Furniture using a fake WSDL and purchase
items with that credit. Because the retail fraud involved the
same participants as the bank fraud, the same *modus ope-
randi*, and was part of ongoing fraudulent transactions related
to the stolen personal identification information and fake

WSDLs, the district court did not err by including the retail fraud loss in its calculations.[11]

Finally, Armstead contends that there was an insufficient factual basis for including the $107,000 and $50,000 in the loss amount. Armstead argues that the $107,000 is suspect because it includes deposits from a family member and because of possible overlap between the $107,000 and the Secret Service calculation. He seeks to exclude the $50,000 from Hill because the latter's testimony was uncorroborated and not credible. The district court was "extremely skeptical" of counting all of the $107,000 in the loss amount. Nonetheless, the court determined that it was reasonable to include at least $3,001 from Armstead's account (the amount needed to push the loss total from the $397,000 in the PSR calculation to over $400,000) because the evidence showed that at least some of the deposits were the fruit of criminal conduct. The district court did not separately comment on the $50,000.

[8] The bank fraud conspiracy ran from 2001 through 2004. The Secret Service calculation covers a period from September 2003 to September 2004. From February 2003 to August 2003, a period not covered by the Secret Service calculation, $44,150.94 was deposited into Armstead's account, not including deposits from Armstead's relative. State employment records show that Armstead only earned $3,000 in wages from 1998 to 2004. Thus, the district court did not clearly err by including $3,001 from the $107,000 in deposits in the loss calculation.

[9] With regard to the $50,000, we note that the sentencing judge also presided over Armstead's trial and thus observed the witness and heard Hill's testimony. Hill testified that Armstead gave him $50,000 in 2000 or 2001 for safekeeping and that he "knew" that the proceeds came from the conspir-

---

[11]Because the district court did not err, we do not proceed to the additional factors in the plain error analysis.

acy. We reiterate that deference to a district court's loss calculation is warranted because the district court "is in a unique position to assess the evidence." U.S.S.G. § 2B1.1, cmt. n.3(C). The district court did not clearly err by giving credence to Hill's testimony and determining by a preponderance of the evidence that the $50,000 corresponded dollar-for-dollar to loss from the bank fraud.

**[10]** In sum, the district court did not err by adding fourteen levels to Armstead's base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(H) for a loss amount of more than $400,000.

## D.   Victim Calculation Pursuant to U.S.S.G. § 2B1.1(b)(2)

When calculating the Guidelines range for bank fraud, a district court must also determine the number of victims. U.S.S.G. § 2B1.1(b)(2). The district court found that the bank fraud conspiracy involved over fifty victims and added four levels to Armstead's base offense level pursuant to U.S.S.G. § 2B1.1(b)(2)(B). The district court arrived at this number by adding the number of banks and victims of retail fraud (sixteen) together with an unstated number of individuals and companies whose personal information was stolen by the conspirators. The Government proffered at sentencing that the individuals and companies suffered pecuniary losses in the form of "getting a new driver's license, or having to figure out how to put a fraud alert on your account and spending money to correct credit." The district court offered little in the way of an explanation for its finding that there were more than fifty victims, but concluded "that there were a substantial number of people involved."

Armstead contends that the district court erred by counting as victims those individuals and companies whose losses were not included in the loss calculation. We agree.

**[11]** The Guidelines define victim as "any person who sustained any part of the actual loss determined under subsection

(b)(1)." U.S.S.G. § 2B1.1, cmt. n.1. " 'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. n.3(A)(i). " 'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money." U.S.S.G. § 2B1.1, cmt. n.3(A)(iii). Thus, in order to be counted as a victim, a person[12] must have sustained a loss that is "monetary or that otherwise is readily measurable in money" *and* that loss must be included in the loss calculation. Here, the loss calculated pursuant to U.S.S.G. § 2B1.1(b)(1) included only losses to the thirteen banks and three victims of retail fraud. While other persons conceivably may have sustained pecuniary harm in the form of time and money spent procuring new identification and credit cards, opening new bank accounts, and mending their credit, those losses were not included in the calculated loss amount. Therefore, the district court erred by including those individuals in the number-of-victims calculation.

Our conclusion is in accord with the other circuits that have considered the issue. The defendants in *United States v. Abiodun* were convicted of, *inter alia*, conspiracy to commit fraud and wire fraud. 536 F.3d 162, 163 (2d Cir. 2008). Their fraudulent scheme involved stealing credit reports, obtaining credit cards with the information procured, and purchasing merchandise with the ill-gotten credit. *Id.* at 164-65. The district court included in its victim calculation persons "who had spent an appreciable amount of time securing reimbursement for their financial losses." *Id.* at 166. The Second Circuit held that this was error "because the losses attributable to these victims were not included in the loss calculation." *Id.* at 168. The court noted that loss of time is a pecuniary harm because it can be measured in monetary terms, but that losses due to lost time were not included in the loss calculation. *Id.* at 169.

---

[12]" 'Person' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." U.S.S.G. § 2B1.1, cmt. n.1.

The Tenth Circuit addressed the victim calculation in the context of a fraudulent scheme in which the defendant, a postal employee, stole mail addressed to a non-profit organization. *United States v. Leach*, 417 F.3d 1099, 1101 (10th Cir. 2005). The district court calculated the loss amount by taking the total donations the non-profit organization reported missing and subtracting "replacement donations" sent to the non-profit by the donors. *Id.* at 1105-06. The district court based its victim calculation on the over 200 persons who reported that their donations had not been delivered. *Id.* at 1106. The district court found that those persons suffered losses because they had to write and mail replacement checks. *Id.* The Tenth Circuit held that the 200 donors were not victims under U.S.S.G. § 2B1.1(b)(2). *Id.* at 1107. While the donors suffered pecuniary harm, their loss "was not included as part of the actual loss 'determined under subsection (b)(1).' " *Id.* at 1106 (quoting U.S.S.G. § 2B1.1, cmt. n.1). *Cf. United States v. Icaza*, 492 F.3d 967, 969-70 (8th Cir. 2007) (holding that each individual store was not a separate victim of shoplifting where all stores were owned by the same corporation).

Over fifty persons in the present case conceivably may have suffered pecuniary harm. The loss calculation, however, only included losses to the thirteen banks and three victims of retail fraud. As a result, the district court erred in finding more than sixteen victims. *See United States v. Pham*, 545 F.3d 712, 719 (9th Cir. 2008) (holding that individual account holders can be counted as victims "only if they 'sustained any part of the actual loss determined under' § 2B1.1(b)(1)") (citing U.S.S.G. § 2B1.1 cmt. n.1).

The government counters that the loss calculation reflects more than fifty victims because the losses attributed to the banks were first held by the account holders prior to the reimbursement of funds. We have not fully addressed when persons whose losses are so reimbursed may be included in the victim calculation.

The Sixth Circuit addressed this issue in *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005). Like Armstead, the defendant in *Yagar* stole checks, deposited them into more than fifty accounts using stolen personal information and then withdrew the deposited funds from forty-seven accounts. *Id.* at 968. The district court counted eleven victims: five banks and six account holders who had to purchase new checks. *Id.* at 969. On appeal, the government argued that the district court should have found over fifty victims by including all account holders who temporarily lost funds. *Id.*

The Sixth Circuit held that the account holders who did not purchase replacement checks were not victims because the temporary loss of funds did not amount to a pecuniary harm. *Id.* at 971. The court reasoned that such a "short-lived" loss, which was "immediately covered by a third-party," had "no adverse effect as a practical matter." *Id.* The court declined to hold that a fully reimbursed loss is always a bar to including a person in the victim calculation, noting that there "may be situations in which a person could be considered a 'victim' under the Guidelines even though he or she is ultimately reimbursed." *Id.*

Recently, the Fifth Circuit followed *Yagar* in evaluating the number of victims in a credit card fraud scheme. *United States v. Conner*, 537 F.3d 480, 489-90 (5th Cir. 2008). The court concluded that credit card account holders could not be counted as victims because they were "quickly reimbursed" and there was no evidence "that any account holder had to spend money or an extended length of time seeking reimbursement." *Id.* at 491. The only victims were the five credit card companies that reimbursed the account holders. *Id.* at 492.

More recently, we held in *Pham* that an individual may be considered a victim even if the individual's losses are fully reimbursed, provided the reimbursement was not immediate. 545 F.3d at 716-20. We stated that a court can count both

account holders and reimbursing banks as victims, even if the "losses are ultimately traceable to the same fraudulently obtained funds," because "both the account holders and the banks have suffered harms that are 'pecuniary' and 'reasonably foreseeable' . . . and that are sufficiently distinct from one another to avoid a double counting problem." *Id* at 717-18. We rejected the argument that a victim must suffer additional pecuniary harm other than the reimbursed loss. *See id.* at 718.

The Guidelines direct the court to calculate victims by determining the number of persons who have suffered pecuniary harm. A loss that is reimbursed immediately does not amount to a pecuniary harm because the ultimate loss cannot be measured in monetary terms. If, however, the reimbursement takes a longer period of time, it is conceivable that the individual may "have suffered or 'sustained' " part of the loss. *Id.* at 719. If that loss is included in the loss calculation, the victim associated with the loss should be included in the victim calculation. *See id.*

We thus decline to follow the approach taken by the Eleventh Circuit in *United States v. Lee*, 427 F.3d 881 (11th Cir. 2005), and hinted at in *Yagar* and *Conner*, which would allow the district court to include as victims persons who were fully reimbursed if their losses "were neither short-lived nor immediately covered by third parties" without regard to whether their losses were included in the loss calculation. *Lee*, 427 F.3d at 895. The defendants in *Lee* cancelled their checking accounts but continued to write personal checks, and, in that manner, purchased miscellaneous goods, cars, motorcycles, property, and paid off mortgages. *Id.* at 884-85. When the checks were not honored, some entities wrote off losses, others received payment from defendants, some repossessed the merchandise, and a mortgage company foreclosed on one of the defendant's homes. *Id.* at 885-86. The district court calculated the loss at over $400,000 and determined that the number of victims was between ten and fifty. *Id.* at 893-94.

The defendants argued that the persons who "offset" their losses by repossession or other forms of reimbursement could not be included in the victim calculation. *Id.* at 894. The Eleventh Circuit disagreed, and held that the district court did not err by including all of the individuals who received bad checks in the victim calculation. *Id.* at 895. The court first reasoned that the credit against loss provision in the Guidelines, U.S.S.G. § 2B1.1, cmt. n. 3(E), envisions a situation in which a victim is reimbursed for losses but remains a victim. *Lee*, 427 F.3d at 895. Second, the court distinguished its case from *Yagar*, noting that the losses borne by the victims "were neither short-lived nor immediately covered by third parties." *Id.*

[12] While we agree that persons who are reimbursed may suffer pecuniary harm, we disagree with the approach taken in *Lee*. A court should analyze and quantify pecuniary harm when making the loss calculation, not when determining the number of victims. If a person suffered pecuniary harm beyond the amount by which the person was reimbursed, then that amount should be included in the loss calculation. Once a loss amount is included in the loss calculation, then the person associated with that loss should also be included in the victim calculation.[13]

---

[13]We agree with the Eleventh Circuit that the credit against loss provision may result in a situation in which a victim's loss amount is included in the loss calculation but the loss is subsequently reduced by the amount the defendant returned to the victim. *See* U.S.S.G. § 2B1.1, cmt. n.3(E). In such a case, we see no bar to including that victim in the victim calculation because that person's loss was included in the loss calculation prior to the credit. We so conclude because the Guidelines draw a distinction between "Exclusions from Loss," U.S.S.G. § 2B1.1, cmt. n.3(D), and "Credits Against Loss," U.S.S.G. § 2B1.1, cmt. n.3(E). The former are not included in the loss calculation whereas the latter simply reduces the amount of loss. Losses that are subsequently credited are still part of the initial loss calculation, and thus persons who suffered those losses are victims because they "sustained a[ ] part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1, cmt. n.1. The credit against loss provision is inapposite to Armstead's case, however, because the individuals from whose bank accounts conspirators withdrew money were reimbursed by the banks, not by Armstead.

**[13]** Here, the district court erred by applying a four-level enhancement for fifty or more victims when the loss calculation only included losses incurred by sixteen victims. Because an error in the Guidelines calculation is a significant procedural error, *Carty*, 520 F.3d at 993, we vacate Armstead's sentence and remand for resentencing.[14]

## E. Credit for Time Served Pursuant to U.S.S.G. § 5G1.3(b)(1)

Armstead contends that the district court erred by failing to apply U.S.S.G. § 5G1.3(b)(1), which would have given him five months' credit for time served on an undischarged state sentence. That Guideline provides that if:

> a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct) and that was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments), the sentence for the instant offense shall be imposed as follows:
>
>> (1)  the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment . . . .

U.S.S.G. § 5G1.3(b). The PSR recommended, and the govern-

---

[14]Because we conclude that the district court erred by including individuals other than the banks and victims of retail fraud in the victim calculation, we do not reach Armstead's argument that the alleged pecuniary harms were not supported by the record and had to be excluded from any loss calculation as losses "similar" to "finance charges, late fees, [and] penalties." *See* U.S.S.G. § 2B1.1, cmt. n.3(D)(i).

ment does not dispute, that Armstead was eligible for five months' credit for time served on a state conviction because the conduct that resulted in the state conviction was used to calculte the Guidelines range for his federal sentence. At the sentencing hearing, however, the district court did not mention § 5G1.3(b)(1) or adjust Armstead's sentence for the time served. Because Armstead did not object at sentencing, we review for plain error. *Rendon-Duarte*, 490 F.3d at 1146.

The Guidelines are now advisory. *United States v. Booker*, 543 U.S. 220, 245 (2005). Even so, the Guidelines remain central to the sentencing regime. "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 128 S. Ct. at 596. The district court must begin the sentencing process by acccurately calculating the Guidelines range. *Carty*, 520 F.3d at 991 ("All sentencing proceedings are to begin by determining the applicable Guidelines range."). The court's consideration of the Guidelines does not, however, end there. After the Guidelines range is calculated, the court must "determine from Parts B through G of Chapter Five the sentencing requirements and options related to probation, imprisonment, supervision conditions, fines, and restitution." U.S.S.G. § 1B1.1(h).

**[14]** Here, after calculating the Guidelines range, the district court did not consider § 5G1.3(b)(1), contrary to the express direction in § 1B1.1(h). Section 5G1.3(b)(1)'s language is mandatory: "the court *shall* adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment." (Emphasis added.) The district court erred in not including this adjustment in its Guidelines calculation as "the starting point" of the sentencing proceeding. *Gall*, 128 S. Ct. at 596.

**[15]** This error was compounded by the court's failure to give any reason for its decision — if it, indeed, made such a decision — not to apply the adjustment. Because the provi-

sion is mandatory, a court's declining to make the adjustment results in a sentence that departs from the Guidelines. *See United States v. Fifield*, 432 F.3d 1056, 1061 (9th Cir. 2005) (explaining that the imposition of consecutive sentences contrary to § 5G1.3(b)(2), when applicable, is a deviation from the Guidelines). Because the Guidelines are now advisory, a sentencing court is free to impose a sentence outside of the Guidelines. If it does so, however, the court must adequately explain the reason(s) for the deviation. *Carty*, 520 F.3d at 992 ("[T]he judge must explain why he imposes a sentence outside the Guidelines.") (citing *Rita*, 127 S. Ct. at 2468; *Gall*, 128 S.Ct. at 594). Thus, the court's failure to provide a justification for its decision not to apply the § 5G1.3(b)(1) credit for time served was error. *See United States v. Lane*, 509 F.3d 771, 775-76 (6th Cir. 2007) (finding no error where the district court explained that applying the § 5G1.3(b)(1) credit would not properly reflect the § 3553(a) factors).

It remains to determine whether the district court's error in failing to give the § 5G1.3(b)(1) credit *and* in also failing to explain or justify its action is plain error. "An error is plain if it is 'contrary to the law at the time of appeal.' " *United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en banc) (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)). Because, as explained above, both the Supreme Court and this court have repeatedly emphasized the centrality of the Guidelines and the need for the sentencing court to explain any deviation from the Guidelines, we conclude that the error is plain. We further conclude that the error affected Armstead's substantial rights, given that the starting point for consideration of the § 3553(a) factors was five months higher than it should have been. *See United States v. Rodriguez-Lara*, 421 F.3d 932, 949 (9th Cir. 2005) (holding that the defendant's substantial rights were affected where the defendant "was entitled to a lower Guideline range than that under which he was actually sentenced"). Moreover, it appears from the sentencing record that the sentence was based on the erroneous belief that it was the highest within-Guidelines sen-

tence. If the Guidelines sentence had been adjusted for the time-served credit, the highest within-Guidelines sentence would have been five months shorter.

**[16]** Finally, we hold that the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Rendon-Duarte*, 490 F.3d at 1146 (quoting *Olano*, 507 U.S. at 732). As the Supreme Court has explained, § 5G1.3(b) protects a defendant "against having the length of his sentence multiplied by duplicative consideration of the same criminal conduct." *Witte v. United States*, 515 U.S. 389, 405 (1995). For reasons unexplained on the record, most likely an oversight, Armstead was denied this protection. This error seriously affects the integrity of judicial proceedings because it may well be that, had the district court considered the credit under § 5G1.3(b)(1), it still would have sentenced him to the top of the Guidelines sentence, which would have been five months less.

**[17]** We conclude that the district court clearly erred in not considering the effect of § 5G1.3(b)(1) on its sentence. At resentencing, the court should either give Armstead five months' credit for time served under § 5G1.3(b)(1) or explain why it declines to apply that sentencing adjustment.

## F.   Procedural Challenges Under § 3553(a)

Armstead further contends that the district court erred by misstating the parsimony provision in 18 U.S.C. § 3553(a) and failing to address his parity argument when discussing the § 3553(a) factors. Because any imposition of a sentence must start with a correct Guidelines calculation, *Carty*, 520 F.3d at 991, on remand, the district court will have to reconsider the § 3553(a) factors with the correct Guidelines range in mind. Thus, we decline to reach Armstead's procedural arguments with regard to the application of the § 3553(a) factors.

## III. CONCLUSION

Having concluded that the district court committed significant procedural error, we do not address the substantive reasonableness of Armstead's sentence. We vacate Armstead's sentence and remand for resentencing in accordance with this opinion.

**VACATED and REMANDED**.